[948 NYS2d 245]

VERIZON NEW ENGLAND INC., Appellant, v TRANSCOM ENHANCED SERVICES, INC., Respondent.

First Department, June 28, 2012

### APPEARANCES OF COUNSEL

*Gibson, Dunn & Crutcher LLP*, New York City (*Robert L. Weigel* and *Jason W. Myatt* of counsel), for appellant.

*Arent Fox LLP*, New York City (*Hunter T. Carter* and *Matthew S. Trokenheim* of counsel), for respondent.

### OPINION OF THE COURT

CATTERSON, J.

In this CPLR article 52 turnover proceeding, we affirm that a restraining notice is effective only if, at the time of service, the third party on whom the notice is served owes a debt to, or is in possession of property of, the judgment debtor.

In this proceeding, Verizon, the judgment creditor, seeks to enforce a restraining notice against a third party pursuant to article 52 of the CPLR, on monies paid by Transcom Enhanced Services, Inc. (hereinafter referred to as Transcom) to judgment debtor, Global NAPs, Inc. (hereinafter referred to as GNAPS), a telecommunications vendor. Transcom purchased voice-over-internet termination services for its customers from GNAPS.

The following facts are undisputed: On January 29, 2009, the U.S. District Court for the District of Massachusetts entered a $57,716,714 judgment in favor of Verizon and against GNAPS and others. The judgment was affirmed. (*See Global NAPs, Inc. v Verizon New England Inc.*, 603 F3d 71 [1st Cir 2010], *cert denied* 562 US —, 131 S Ct 1044 [2011].)

On March 6, 2009, Verizon domesticated the judgment in New York. On March 30, 2009, Verizon served Transcom, a New York corporation, with a restraining notice and information subpoena. The restraining notice directed Transcom not "to make or suffer any sale, assignment or transfer of, or interfer-

ence with, any property in your possession in which [GNAPS] . . . has as interest."

On or about February 11, 2010, Transcom served its response to the information subpoena. In response to question No. 2, which directed Transcom to "[i]dentify any and all . . . agreements entered into between you . . . and any of the Judgment Debtors," Transcom identified a telephone switch service agreement dated October 21, 2003.

In response to question No. 5, which asked Transcom to identify any receivables and outstanding obligations owed to GNAPS, Transcom stated, "None. All payments are made in advance or contemporaneously with service." In response to question No. 11, which asked Transcom to identify payments made to GNAPs, Transcom annexed a Vendor Balance Detail (hereinafter referred to as VBD). The VBD reflected that on April 1, 2009, the day before Transcom's acceptance of the restraining notice, Transcom had received a $246,000 bill from GNAPS. The bill was paid by four checks issued for April 1, April 6, April 15 and April 21, each in the amount of $61,500.

On or about March 31, 2010, Verizon commenced a special proceeding seeking, inter alia, a turnover of property and debts of the judgment debtor held by Transcom, a judgment equal to the amount paid by Transcom to the judgment debtors in violation of the restraining notice, and a finding of civil contempt. Verizon asserted that Transcom's agreement with GNAPS created an ongoing contractual relationship which required Transcom to pay GNAPS $281,000 per month.

Transcom asserted that it did not violate the restraining notice because GNAPS' monthly invoices were issued in advance of services being rendered, and Transcom had no obligation to use GNAPS' services. Transcom explained that, because it prepaid for GNAPS' services at the time that the restraining notice was served, Transcom did not owe GNAPS any money.

Transcom submitted the affidavit of Larry Dewey, its chief accounting officer and a CPA whose duties included managing payments to GNAPS. He set forth that, since 2004 GNAPS had invoiced Transcom on or at the beginning of each month for services to be rendered in the following month and Transcom paid in advance for services to be rendered on an approximately weekly basis. Dewey set forth that, as of April 2, 2009, Transcom had a credit balance with GNAPS and no obligation to make future payments. He issued the April 1 check to GNAPS by overnight delivery for services to be rendered the first week in April. Dewey stated that

"because Transcom and GNAPS have always operated . . . under the assumption that Transcom pays in advance for services, and GNAPS only provides services if it has been paid. Transcom . . . could easily switch to [other] vendors and discontinue using GNAPS simply and quickly by entering a blocking code in the network operations center."

Transcom also submitted the affidavit of Bradford Masuret, GNAPS' vice-president of sales, who set forth that the parties verbally agreed to allow Transcom to prepay in four installments, rather than the two provided for in the written agreement.

By order, dated April 12, 2010, the court declined to extend the terms of the restraining notice, and scheduled the matter for a hearing on April 19, 2010. At that hearing, Transcom called two witnesses, Dewey and Scott Birdwell. Verizon did not call any witnesses and relied on Transcom's response to the information subpoena.

Dewey gave testimony consistent with his affidavit. He stated that Transcom never owed money to GNAPS because it prepaid for services for the following week, making payments for the month in four equal installments. Dewey conceded that, on its face, the VBD reflected a $246,000 accounts payable to GNAPS on April 1, 2009, and a $184,500 debt to GNAPS as of April 2. However, he explained that such a view of "the records would be incomplete," as Transcom did not owe GNAPS any money as of April 2, 2009, and the balance listed as of that date was for services which had not yet been provided.

Scott Birdwell, Transcom's chief executive officer, testified that Transcom's relationship with GNAPS has been "strained" for years due to poor service quality, and that the parties had been operating pursuant to a verbal arrangement for several years because Transcom did not trust GNAPS' financial condition or its reliability in providing service. Under the verbal arrangement, Transcom prepaid for services one week in advance, committing itself to take services only for the week covered by the prepayment. After the week, if GNAPS service was still running, Transcom would then pay for the following week. The court denied the turnover, dismissed the petition, vacating all restraints, and denied the application to hold Transcom in contempt. (27 Misc 3d 1236[A], 2010 NY Slip Op 51073[U] [2010].) The court credited Dewey's and Birdwell's testimony as to the oral modification of the payment terms of the agreement,

and found that such modification was proper under Massachusetts law, which governed. The court further found that the prepayment for services was not a form of property or debt subject to restraint.

On appeal, Verizon argues that, as of April 2, 2009, Transcom possessed GNAPS' property, and contemptuously continued paying GNAPS, entitling Verizon to damages in the amount improperly paid. Verizon further argues that GNAPS' "bundle of rights" under the agreement was property subject to restraint, regardless of any prepayment, especially concerning the outstanding balances reflected in the VBD for April 2009. Verizon also maintains that the court erred in finding that the agreement was terminable at will, as there was no testimony that the requirement of 30 days' written notice was modified.

For the reasons set forth below, we find that Transcom, the third-party garnishee, owed no debt, but rather held a credit balance with GNAPS. Moreover, the undisputed modified agreement between GNAPS and Transcom dispensed with any contractual obligations or "bundle of rights" that could be considered attachable property.

CPLR 5222 (b), in relevant part, states:

> "A restraining notice served upon a person other than the judgment debtor or obligor is effective only if, at the time of service, he or she owes a debt to the judgment debtor . . . or . . . is in the possession or custody of property in which . . . the judgment debtor . . . has an interest . . . . All property in which the judgment debtor . . . is known or believed to have an interest then in and thereafter coming into the possession or custody of such a person, including any specified in the notice, and all debts of such a person, including any specified in the notice, then due and thereafter coming due to the judgment debtor . . . shall be subject to the notice."

In this regard, "[a] money judgment may be enforced against any debt, which is past due or which is yet to become due, certainly or upon demand of the judgment debtor." (CPLR 5201 [a].) Additionally, "[a] money judgment may be enforced against any property which could be assigned or transferred, whether it consists of a present or future right or interest and whether or not it is vested." (CPLR 5201 [b].)

The statute therefore codifies well-established principles by eliminating enforcement of judgment, whether by attachment

or restraining notice on a third party, on a general category of contingent debts and property rights based on contractual contingencies. (*See Matter of Supreme Mdse. Co. v Chemical Bank*, 70 NY2d 344, 350 [1987] [statute precludes the "levy against contingent obligations not certain to ripen into something real" (internal quotation marks omitted)]; *see also Glassman v Hyder*, 23 NY2d 354, 358 [1968] [where "a duty to pay is conditioned . . . upon contractual contingencies, there is no debt certain to become due"]; *Sheehy v Madison Sq. Garden Corp.*, 266 NY 44, 47 [1934] [judgment debtor's right to payment was not attachable because it was a "mere right to earn money" and was entirely contingent upon judgment debtor's performance]; *Herrmann & Grace v City of New York*, 130 App Div 531, 535 [1909], *affd* 199 NY 600 [1910] ["indebtedness is not attachable unless it is absolutely payable at present or in the future, and not dependable upon any contingency"].)

In this case, it is undisputed that the contract between Transcom and GNAPS was orally modified to one based on Transcom's weekly prepayment for services. The contract no longer contained the previous terms of payments by Transcom every half-month for the following half-month's services and where the agreement was automatically renewed and subject to 30 days' notice.

At the time of the restraining notice issued by Verizon, it is uncontested that Transcom was ordering GNAPS services on a weekly basis by weekly prepayment. Supreme Court credited the uncontroverted testimony of Transcom executives that Transcom was not contractually bound to purchase the services and there was no exclusive relationship between it and GNAPS. Thus, there was no debt due or certain to come due "by the mere passage of time [or by demand of the judgment creditor]." (*See* Siegel, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C5201:1.) Transcom's prepayment effectively gave it a credit balance with GNAPS upon which GNAPS had an obligation to provide the service.

Nevertheless, Verizon argues that "the timing of the payments to [GNAPS] does not alter [GNAPS'] right to be paid for the services it delivers." Verizon relies on *ABKCO Indus. v Apple Films* (39 NY2d 670 [1976]), to argue that the fact that no monies were owed to GNAPS at the time the restraining notice was served is not relevant. Rather, Verizon argues that the prepayments are a "bundle of GNAPS' rights" under the agreement, and therefore attachable property. The dissent adopts this view. Verizon and the dissent miss the point.

In *ABKCO*, the judgment debtor, LTD, owned a movie "Let It Be," which featured the Beatles. LTD entered into a licensing agreement with a New York corporation, INC, which agreed to promote the movie in the United States and to pay LTD 80% of the net profits from the promotion. The Court found that ABKCO, a judgment creditor, had an attachable interest in the right to future net profits received from the promotion of a film. (39 NY2d at 674.) The *ABKCO* Court rejected LTD's argument that the rights were not attachable because no sums were due at the time of attachment and because it was not known whether any amounts would become due since they were contingent on gross receipts. Instead, the Court found that LTD's interests in the licensing agreement

> "constituted property, composed of the bundle of all its rights under the Agreement, of which . . . the obligation of INC to pay [LTD] under the 80% clause [relating to net profits received by INC from the promotion of the film] was the principal feature of economic significance. That property was attachable because concededly it was assignable by LTD." (39 NY2d at 674, citing CPLR 5201 [b].)

*ABKCO* is not analogous to the instant case: *ABKCO* stands for the proposition that if one of the judgment debtor's rights under a contract is an obligation by the other party to pay some amount at some future date, that right is assignable and attachable even if the value is contingent. In other words, under the ABKCO agreement LTD had an unconditional right to receive 80% of gross receipts from the promotion of the movie. The fact that the 80% did not translate into a stated amount in dollars and cents at the time of attachment was irrelevant. It was not LTD's rights that were contingent, but simply the value of those rights.

Upon a "proper analysis and classification of [GNAPS'] rights under the . . . [a]greement" as mandated by *ABKCO* (39 NY2d at 674), we must conclude that GNAPS does not have any rights under the modified agreement: there is simply no obligation for Transcom to purchase services from GNAPS. Thus, GNAPS has no right to payment that it could assign or that could be attached by its judgment creditors. Transcom correctly asserts that a contract is not a property subject to possible attachment if that contract does not obligate the other party to pay the judgment debtor, or if the obligation to pay is contingent upon some uncertain future act of performance by the parties. (*See Matter of Supreme Mdse. Co.*, 70 NY2d at 351.)

Moreover, contrary to Verizon's argument, the modified agreement dispensed, de facto, with the 30-day notice requirement, and thus with any possible property interest GNAPS may have held in such notice. As Transcom's executives testified, the modified agreement resulted, in part, because of GNAPS' unreliability in providing the service; Transcom therefore required the flexibility to switch vendors, "literally at the flip of a switch." Thus, the credited and uncontroverted testimony of two Transcom executives supports the view that a 30-day notice requirement would have been inconsistent with the nature of the modified agreement and the reasons for such an agreement. This, instead, was a situation where GNAPS' performance depended on Transcom's prepayment for services in any given week, and therefore involved "intangibles that may never ripen into a significant property right as where they depend on a contingency that may never occur." (*See Matter of Supreme Mdse. Co.*, 70 NY2d at 350.)

In *Matter of Supreme Mdse. Co.*, the Court rejected the existence of an attachable property right under an agreement where contingent performance was wholly in the control of the judgment debtor. In that case, the Court found that a beneficiary's interest in a letter of credit is not the property of the beneficiary for purposes of attachment since the beneficiary's interest is dependent on its own future performance (timely shipment of goods, compliance with terms of credit and presentation of conforming documents). (70 NY2d at 350-351.) The Court found that, since the beneficiary "retains the option to defeat the interest and render it worthless, . . . allowing attachment . . . could serve as a disincentive to a beneficiary's performance of the underlying contract." (*Id.*)

The Court cautioned that this factor alone is not dispositive in any determination of whether an attachable property interest exists. However, the rationale should be applied to the facts of the instant case where Verizon argues that Transcom could have stopped payment on the check it sent to GNAPS on April 1, 2009. Once Transcom sent the check, contrary to the dissent's view, the contingent performance would have been solely within the control of GNAPS, the judgment debtor. Further, it is clear that compliance with the restraining notice not only "could serve as a disincentive," but almost certainly would result in GNAPS declining to provide the weekly service for which the check had been sent.

The dissent's observation that it would be "unfortunate," but "irrelevant" if, as a result of Transcom's compliance with the

restraining notice, GNAPS terminated its service to Transcom, indicates that it completely misapprehends the economic nature of their business relationship. Upon the failure of GNAPS to provide service to Transcom, the latter would be compelled to switch to another supplier/vendor whereupon its "highly regular and predictable business relationship" with GNAPS would terminate, and would thus stop generating any revenues for GNAPS. The net result is that Verizon might gain $61,500 (the amount of the check sent on April 1 for GNAPS' weekly service) in partial satisfaction of a $57 *million* judgment; but it would have caused a loss to, and disrupted the business of, an innocent bystander garnishee. Setting aside for the moment, the public policy concern implicit in such a result, more significantly, Verizon would find itself in a situation that the Legislature expressly put beyond the grasp of the statute: levying against a contingent obligation that, in this case, was never again going to "ripen into something real." (*Matter of Supreme Mdse. Co.*, 70 NY2d at 350 [internal quotation marks omitted].) If the Legislature wants to expand the scope of the statute, it may do so but it is not up to this Court to make this change.

Moreover, contrary to the dissent's view that "the manner in which Transcom structured its transactions with [GNAPS] could be said to reveal its knowledge of [GNAPS'] plan to shirk its responsibilities," there simply are no allegations, nor any evidence in the record, that the agreement was forged with the intent of facilitating GNAPS' avoidance of attachment of debt owed to third parties. On the contrary, according to the testimony of Transcom's executive officers, the agreement to prepay for services was nothing more than a consequence of GNAPS' unreliability in its provision of services, and was a deal struck for the benefit of Transcom.

Accordingly, the judgment of the Supreme Court, New York County (Anil C. Singh, J.), entered July 20, 2010, to the extent appealed from as limited by the briefs, dismissing the petition with prejudice, should be affirmed, with costs.

MAZZARELLI, J.P. (dissenting). In an unrelated litigation, petitioner Verizon New England Inc. (Verizon) secured a judgment against nonparty Global NAPs, Inc. (Global) in the amount of $57,716,714. On March 30, 2009, Verizon served respondent Transcom Enhanced Services, Inc. (Transcom), a regular customer of Global, with a restraining notice and information subpoena. Transcom admits to receiving those documents on or about April 2, 2009. The restraining notice directed Transcom

not "to make or suffer any sale, assignment or transfer of, or interference with, any property in your possession in which [Global] . . . has as interest." It "applie[d] to all property in which [Global] . . . presently has or is believed to have an interest, and to all property hereafter coming into the possession or custody of [Global]."

Transcom had purchased telecommunications services from Global since 2003, when the two companies entered into a "Telephone Switch Service Agreement." While the agreement did not require Transcom to purchase services from Global, it established the framework that would be utilized if it did. Should Transcom order services from Global, the agreement required Transcom to pay Global's monthly charges in two installments and pay Global "the set up fee and the first one half of the monthly trunk charge prior to provid[ing] service. Subsequent one half of the monthly trunk charges will be billed in advance of the half of the month to which they apply," with payments to "be made without set off." The agreement was subject to an initial six-month term, to be automatically renewed on a monthly basis, unless either party provided the other with 30 days' written notice of its intent not to renew and could be amended only by a writing.

In responding to the information subpoena, Transcom identified the agreement and stated that "[c]urrently, the Agreement requires payment of a monthly recurring charge of $28,000 per circuit for eight (8) circuits, along with additional charges of $57,000 per month." However, when asked to identify all receivables or outstanding obligations owed by it to Global, Transcom replied in its response to the information subpoena that there were "[n]one. All payments are made in advance or contemporaneously with service." In response to a question requesting any payments made by Transcom to Global within the last five years, Transcom attached a ledger called a "Vendor Balance Detail" (VBD). This showed all of the transactions between Transcom and Global from December 1, 2004 through January 27, 2010. The VBD reflected that, on April 1, 2009, the day before its acceptance of the restraining notice, Transcom received a $246,000 bill from Global and that prior to that there had been a zero dollar balance. The bill was paid in four checks, each in the amount of $61,500. The first check was issued on April 1, leaving an outstanding balance of $184,500. The other three checks were paid on April 6, April 15 and April 21. The VBD reflects a pattern of Transcom paying amounts owed in

weekly installments, with more than $2.4 million in payments made to Global between April 2, 2009 and January 27, 2010.

Verizon commenced this special proceeding seeking to compel Transcom, among other things, to turn over to it monies which it paid to Global after receipt of the restraining notice, and for a finding of civil contempt. Verizon asserted that Transcom's agreement with Global created an ongoing contractual relationship which required Transcom to pay Global $281,000 per month. In response, Transcom argued that it did not violate the restraining notice because Global's monthly invoices were issued in advance of services being rendered. According to Transcom, the invoices were essentially offers to provide service and imposed no obligation on Transcom to make any payments at all. Thus, Transcom claimed, Global never had an expectation of payment from Transcom which could have served as the basis for attachment by Global's judgment creditors.

The court scheduled the matter for a hearing. At that hearing, Transcom called two witnesses. The first was Larry Dewey, Transcom's chief accounting officer. Dewey was responsible for paying and recording Global's invoices. He stated that Transcom never owed money to Global because it prepaid for services rendered the following week, making payments for the month in four equal installments. Dewey explained that the April 1, 2009 entry in the VBD referred to a March 1 invoice for services to be rendered in April. As the invoice was for April charges, Dewey entered it in the system for that month as an accounts payable item. He conceded that, on its face, the VBD reflected a $246,000 accounts payable to Global on April 1, 2009, and a $184,500 debt to Global as of April 2. However, he explained that such a view of "the records would be incomplete," because Transcom did not owe Global any money as of April 2, 2009, and the balance listed as of that date was for services which had not yet been provided. Dewey also testified that Global was a vendor with no affiliation to Transcom. He was unaware of the agreement's renewal term and stated that the parties had not operated according to the agreement's terms, as Transcom made payments weekly instead of twice per month. Dewey also testified that Transcom never sent Global a notice of termination.

The second witness for Transcom was Scott Birdwell, its chief executive officer. Birdwell testified that Transcom's relationship with Global had been "strained" for years, due to poor service quality, and because Global often lost markets without notice

and frequently lied about the cause of service outages. He also stated that Transcom did not trust Global's reliability to provide service or its financial condition and that, therefore, the parties' course of conduct departed from the terms of the agreement. Indeed, Birdwell explained that for several years the parties had been operating pursuant to a verbal arrangement whereby Transcom prepaid for services one week in advance, committing itself to take services only for the week covered by the prepayment. After the week, if Global's service were still running, Transcom would then pay for the following week. Birdwell testified that the parties had orally amended the agreement, had not entered into any other written agreement, and that Transcom never issued a written notice terminating the agreement.

Birdwell further testified that Transcom had 10 to 20 alternative vendors it could use to provide services in areas covered by Global, and switching to one such provider would involve only "[a] few key strokes on a computer," and be complete in 30 to 60 seconds. Nevertheless, Birdwell stated, Transcom had not discontinued business with Global, as while "[i]t is practical, from a technical perspective . . . [i]t does cost us more, in some cases, to move off of Global." On or about April 2, 2009, Birdwell learned of the restraining notice, but did not direct Dewey to stop making prepayments to Global. He did, however, check to make sure that Transcom owed nothing to Global. While Birdwell conceded that Dewey's "working payments [the VBD] indicate there are" payables, the "point of fact is, there was no amounts owed to [Global] at that point in time." Verizon did not call any witnesses to testify at the hearing.

The court denied the petition in its entirety and vacated the restraining notice (27 Misc 3d 1236[A], 2010 NY Slip Op 51073[U] [2010]). It credited the testimony of Dewey and Birdwell and found that Transcom established that the business relationship with Global was indeed based on prepayment for services and that Transcom was not bound to accept additional services. The court further found that the prepayment for services was not a form of property or debt subject to restraint as the "principle feature of economic significance" was that Transcom had no obligation to purchase services from Global and was thus not in possession of property in which Global had an interest (2010 NY Slip Op 51073[U], *5). The court stated that "[i]n light of this economic reality . . . there is no property or debt in the instant matter subject to a restraining order, levy or turnover pursuant to Article 52 of the CPLR" (id.).

CPLR 5222 (b) provides that a restraining notice is effective against a person only if "at the time of service, he or she owes a debt to the judgment debtor or obligor or he or she is in the possession or custody of property in which he or she knows or has reason to believe the judgment debtor or obligor has an interest." Further, "[a] money judgment may be enforced against any debt, which is past due or which is yet to become due, certainly or upon demand of the judgment debtor" (CPLR 5201 [a]), and "[a] money judgment may be enforced against any property which could be assigned or transferred, whether it consists of a present or future right or interest and whether or not it is vested" (CPLR 5201 [b]).

The Court of Appeals has defined what constitutes property for purposes of being subject to a restraining notice in *ABKCO Indus. v Apple Films* (39 NY2d 670 [1976]), which is the leading decision on the subject. In that case, the recipient of a restraining notice, a film promoter, had entered into a licensing agreement with the judgment debtor, a film owner, pursuant to which the promoter was required to pay royalties to the owner if the former's efforts to promote the film realized profits. However, at the time the judgment creditor served the promoter with a restraining notice, the film had not realized a profit, so it owed the film owner nothing. The Court of Appeals held that the restraining notice was nevertheless effective, because the owner's interest in the licensing agreement "constituted property, composed of the bundle of all its rights under the Agreement, of which, of course, the obligation of [the promoter] to pay [owner] under the [royalty] clause was the principal feature of economic significance. That property was attachable because concededly it was assignable by [the judgment debtor]" (39 NY2d at 674, citing CPLR 5201 [b]).

The only difference between this case and *ABKCO* is that here Transcom was not obligated to turn over monies to Global at any specific time. However, that is not dispositive. Indeed, in *Matter of Supreme Mdse. Co. v Chemical Bank* (70 NY2d 344, 350 [1987]), the case on which Transcom most heavily relies, the Court of Appeals stated that "[d]ispositive instead is whether [a property] interest has potential economic value to the creditor." In *Supreme Mdse. Co.*, the Court found that the asset which was sought to be restrained, a letter of credit issued in favor of the judgment debtor who was the seller in an international transaction, did not have such value. The recipient of the restraint (an order of attachment), was the bank that

had issued the letter of credit. When the restraint was issued, the seller had not yet satisfied the terms of the letter of credit. The Court of Appeals determined that the letter was executory and not subject to restraint. In so holding, the Court stated that "[a] guiding principle in our analysis is that, while CPLR 5201 is obviously intended to have broad reach, still the Legislature expressly put beyond the grasp of the statute the general category of contingent debts, 'to preclude a levy against contingent obligations not certain to ripen into something real' " (70 NY2d at 350, quoting Siegel, NY Prac § 323, at 389).

The Court's focus in *Supreme Mdse. Co.* on whether the interest sought to be restrained has economic value to the judgment creditor supports Verizon's position here. Thus, Transcom's and the majority's reliance on *Supreme Mdse. Co.* is unavailing. As the majority acknowledges, the Court of Appeals in *Supreme Mdse. Co.* was particularly concerned about subjecting letters of credit to restraints, since such instruments are a primary facilitator of international commerce. There is no comparable public policy concern here.

Transcom should not be allowed to ignore the restraining notice when it had every reason to predict that it would continue to do business with Global. Transcom and Global had a highly regular and predictable business relationship which was all but certain to, and in fact did, continue to generate revenues after Transcom received Verizon's restraining notice. Indeed, despite Birdwell's testimony that Transcom found Global to be an unreliable partner and that it had the right to switch to another service provider at any time, it never actually did so. Transcom consistently used and paid for Global's services beginning in December 2004 and continued to do so even after it received Verizon's information subpoena over five years later.

Moreover, the pattern of conduct here demonstrates that *at the time it received the restraining notice from Verizon*, Transcom should have been reasonably "certain" that its relationship with Global had "ripen[ed] into something real" (70 NY2d at 350). The timing is critical because the touchstone is whether a judgment debtor has a particular property interest held by a garnishee at "the time of service" of the restraining notice (CPLR 5222 [b]). By focusing on the series of events that might or might not occur after Transcom's receipt of the restraining notice, the majority ignores this provision.

Further, the majority's bald speculation that had Transcom stopped payment on the check, which was sent the day before

receipt of the restraining notice, it would have placed itself at risk of not receiving services in return, is irrelevant. While this would have been unfortunate, it does not override the need for full compliance with proper judgment enforcement mechanisms. Indeed, just as Transcom may find itself without a business partner if it redirects payment to Verizon, so too might a valued employee stop working for an employer forced to garnish his or her wages, when he receives his or her first diminished paycheck. These are simply accepted risks of the collection system. Nor would my view place Transcom in a different position than other creditors who make a decision to deal with entities that seek to evade their just obligations. In fact, the manner in which Transcom structured its transactions with Global could be said to reveal its knowledge of Global's plan to shirk its responsibilities to Verizon. The majority's narrow view of what constitutes property for purposes of CPLR article 52, judgment debtors and those who transact business with them places in its hands a virtual road map for frustrating the efforts of judgment creditors. The goal of article 52, to promote and ensure the enforceability of money judgments, is too critical to the conduct of commerce in this state to permit that to happen. In light of the clear property interest that Global had in Transcom's payments based on the latter's long and consistent history of making those payments, the laudable purpose of the statute is undermined by the majority's decision to not require Transcom to abide by Verizon's restraining notice.

Accordingly, I believe that Global had a "future interest" in payments from Transcom that constituted property pursuant to the plain language of CPLR 5201 (b), and which was subject to restraint.

RENWICK and RICHTER, JJ., concur with CATTERSON, J.; MAZZARELLI, J.P., and FRIEDMAN, J., dissent in a separate opinion by MAZZARELLI, J.P.

Judgment, Supreme Court, New York County, entered July 20, 2010, affirmed, with costs.